UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
BARRY LEE VALLEN

                          Plaintiff,                              02 Civ. 5666 (PKC)

            -against-

                                                                 MEMORANDUM
                                                                 AND ORDER

S.H.T.A. CARROL; S.H.T.A. GANTZ; S.H.T.A.
GONZALES; S.H.T.A. MALFATONE; S.H.T.A.
NELSON; S.H.T.A. LEPER; DR. BENEB TING;
SENIOR S.H.T.A. JOHN DOE; S.H.T.A. MARCH;
S.H.T.A. ADAMS; S.H.T.A. BROWN; S.H.T.A.
JONES; and VARIOUS S.H.T.A. JOHN DOES,
                          Defendants.
------------------------------------------------------------x

P. KEVIN CASTEL, District Judge:

           Plaintiff Barry Lee Vallen brings this action, pursuant to 42 U.S.C. § 1983, al-

leging that he was the victim of multiple patient-to-patient assaults and deprivations of prop-

erty during the time that he resided at the Mid-Hudson Forensic Psychiatric Center ("Mid-

Hudson"), a facility operated by an agency of the state of New York.  In a Memorandum and

Order dated September 2, 2004, I dismissed defendants New York State Office of Mental

Health and Mid-Hudson on the basis of the state's constitutionally-based immunity from suit.

Vallen v. Mid-Hudson Forensic Office of Mental Health, 2004 WL 1948756 (S.D.N.Y. Sept.

2, 2004).  I concluded that the Complaint set forth allegations sufficient to state claims

against the individual defendants for deliberate indifference to confinement conditions that

were seriously and dangerously unsafe.  Id. at *3.  I held that plaintiff's claim did not arise

under the Eighth Amendment because he was not serving a term of imprisonment pursuant to

a conviction, but, generously construed, his pro se Complaint could be read as alleging that

persons acting under color of state law had deprived him, as an involuntarily detained person, of rights protected by the Fourteenth Amendment. Id.

Discovery in this action is now closed. The defendants have moved for summary judgment dismissing the plaintiff's claims. For the reasons explained below, the defendants' motion is granted.

Background

The following facts are taken from plaintiff's pleadings, his sworn deposition testimony or are otherwise not disputed. Where multiple inferences can be drawn from the facts, I have considered only the one most favorable to Mr. Vallen, the non-movant.

In 1984, the plaintiff was charged with two counts of second-degree murder in connection with the death of his parents. (Vallen Dep. at 169) Plaintiff pleaded not guilty by reason of mental illness or defect and was diagnosed as a paranoid-schizophrenic. (Vallen Dep. at 169-71) A Justice of the New York Supreme Court, Orange County, found that, at that point in time, the plaintiff suffered from a dangerous mental illness and ordered that he be committed to a psychiatric facility. (Vallen Dep. at 170) Subsequently, plaintiff was discharged to outpatient care on two occasions, but in each instance he was later recommitted. (Vallen Dep. at 172-84) From April 18, 1997 through June 14, 2000, plaintiff was an inpatient at Mid-Hudson. (Dickson Aff. ¶ 5)

In an order dated July 22, 2002, Chief Judge Michael B. Mukasey dismissed plaintiff's deprivation of property claim and ruled that the State of New York provided adequate post-deprivation remedies for the recovery of lost property. (July 22, 2002 Order at 3) He also ruled that the Complaint inadequately detailed the assault claims, and dismissed those claims without prejudice. (July 22, 2002 Order at 2, 4-5) Plaintiff filed an Amended Complaint ("AC") dated January 24, 2003.

The AC alleges that, during his three years of treatment at Mid-Hudson Forensic Psychiatric Facility, the plaintiff was subjected to violence and threats of violence, and that the individual defendants promoted or failed to prevent these incidents. The individual defendants were employed as security hospital treatment assistants ("SHTAs") who were responsible for assisting psychiatric patients in their day-to-day needs and activities. (DeLusso Aff. ¶¶ 2-3)

Each of the incidents set forth in the AC are discussed below. Generally described, the plaintiff alleges that the defendants either encouraged or failed to intervene in violent attacks that other patients inflicted upon the plaintiff. According to the AC, the defendants were aware that various Mid-Hudson patients had violent histories, and placed these patients in close proximity to the plaintiff. On other occasions, the AC alleges that the defendants displayed pleasure at the attacks on plaintiff that allegedly took place. Plaintiff notes, by way of contrast, that since the year 2000 he has resided at a facility in Rochester, New York, and has never been threatened or assaulted.

Helpfully, as part of their motion papers, the defendants have organized the allegations set forth in the Complaint into sixteen distinct incidents or clusters of incidents. Solely for the purposes of facilitating evaluation and discussion of the incidents, I will refer to the sixteen incidents by the number and descriptive title employed in the defendants' motion papers. (Appendix to this Memorandum and Order) I do not in any way treat the defendants' submission as having any evidentiary quality to it.

Summary Judgment Standard

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a

judgment as a matter of law." Fed. R. Civ. P. 56(c). It is the initial burden of a movant on a summary judgment motion to come forward with evidence on each material element of his claim or defense, demonstrating that he or she is entitled to relief. A fact is material if it "might affect the outcome of the suit under the governing law . . ." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The evidence on each material element must be sufficient to entitle the movant to relief in its favor as a matter of law. Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004).

When the moving party has met this initial burden and has asserted facts to demonstrate that the non-moving party's claim cannot be sustained, the opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on "mere allegations or denials" of the facts asserted by the movant. Fed. R. Civ. P. 56(e). In raising a triable issue of fact, the nonmovant carries only "a limited burden of production," but nevertheless "must 'demonstrate more than some metaphysical doubt as to the material facts,' and come forward with 'specific facts showing that there is a genuine issue for trial.'" Powell v. Nat'l Bd. of Med. Exam'rs, 364 F.3d 79, 84 (2d Cir. 2004) (quoting Aslanidis v. United States Lines, Inc., 7 F.3d 1067, 1072 (2d Cir. 1993)).

An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. Caution is particularly warranted when considering a summary judgment motion in a discrimination action, since direct evidence of discriminatory intent is rare, and often must be inferred. Forsyth v. Fed'n Empl. & Guidance Serv., 409 F.3d 565, 569 (2d Cir. 2005). The Court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party." Allen v. Coughlin, 64 F.3d 77, 79 (2d Cir.

1995) (quotations and citations omitted); <u>accord</u> <u>Matsushita Electric Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587-88 (1986). In reviewing a motion for summary judgment, the court must scrutinize the record, and grant or deny summary judgment as the record warrants. <u>See</u> Fed. R. Civ. P. 56(c). In the absence of any disputed material fact, summary judgment is appropriate. <u>Id.</u>

The defendants have served the <u>pro</u> <u>se</u> plaintiff with the notice explaining the manner in which a party may oppose summary judgment, as required by Local Rule 56.2. I am mindful of the latitude afforded to a <u>pro</u> <u>se</u> party opposing a summary judgment motion. <u>See</u> <u>Forsyth</u>, 409 F.3d at 570 ("special solicitude" owed to <u>pro</u> <u>se</u> litigants opposing summary judgment); <u>Shabtai v. U.S. Dep't of Educ.</u>, 2003 WL 21983025, at *5 (S.D.N.Y. Aug. 20, 2003) (obligation to construe leniently <u>pro</u> <u>se</u> opposition papers on a summary judgment motion). However, a party's <u>pro</u> <u>se</u> status does not alter the obligation placed upon the party opposing summary judgment to come forward with evidence demonstrating that there is a genuine dispute regarding material fact. <u>Miller v. New York City Health & Hosp. Corp.</u>, 2004 WL 1907310, at *9 (S.D.N.Y. Aug. 25, 2004).

<u>Discussion</u>

1. <u>Statute of Limitations Defense</u>

The applicable limitations period for Section 1983 actions is found in the state statute of limitations for personal injury actions. <u>Owens v. Okure</u>, 488 U.S. 235, 249-50 (1989). "Accordingly . . . New York's three-year statute of limitations for unspecified personal injury actions, New York Civil Practice Law and Rules § 214(5), governs section 1983 actions in New York." <u>Ormiston v. Nelson</u>, 117 F.3d 69, 71 (2d Cir. 1997). The statute of limitations begins to accrue "'when the plaintiff knows or has reason to know of the injury

which is the basis of his action.'" Id. (quoting Singleton v. City of New York, 632 F.2d 185, 191 (2d Cir. 1980)).

This action was filed in the pro se office on December 10, 2001, although the Complaint was not formally accepted for filing until July 22, 2002. The timeliness of the Complaint for statute of limitations purposes is measured from the delivery to the pro se office on December 10, 2001. See Ortiz v. Cornetta, 867 F.2d 146 (2d Cir. 1999); Toliver v. Sullivan County, 841 F.2d 41 (2d Cir. 1988). It is undisputed that some of the events alleged in the AC occurred more than three years prior to such delivery, i.e. prior to December 10, 1998.

Here, plaintiff argues that he is entitled to tolling under New York law by reasons of insanity. Once the defendant demonstrates that the claim facially falls within the limitations period, the plaintiff, not the defendant, bears the burden of proof on tolling. See Doe v. Holy See (State of Vatican City), 17 A.D.3d 793, 794 (3d Dep't 2005); Assad v. City of New York, 238 A.D.2d 456, 457 (2d Dep't 1997).

CPLR 208 provides for tolling when "a person entitled to commence an action [was] under a disability because of infancy or insanity at the time the cause of action accrues . . . ." While the words of the statute, taken at face value, might appear to be broad enough to apply to any person suffering from a debilitating mental illness, the New York Court of Appeals has interpreted the statute more narrowly. McCarthy v. Volkswagen of Am., 55 N.Y.2d 543 (1982). The McCarthy Court reviewed the legislative history of the provision and concluded that the legislature intended that CPLR 208 be "narrowly interpreted". Id. at 548. In the words of the Court: "we believe that the Legislature meant to extend the toll for insanity to only those individuals who are unable to protect their legal rights because of an over-all inability to function in society." Id. at 548-549. New York courts have consistently

applied the McCarthy standard to claims of tolling by reason of insanity. See, e.g., Eberhard v. Elmira City School Dist., 6 A.D.3d 971, 973 (3d Dep't 2004) (McCarthy standard not satisfied by claim of post-traumatic stress syndrome); Burgos v. City of New York, 294 A.D.2d 177, 178 (1st Dep't 2002) ("The doctor's affirmation . . . was vague and conclusory in asserting that plaintiff's 'dementia and psychotic disorder [are] due to multiple medical conditions [that] have existed for many years and are permanent,' and thus insufficient to raise an issue of fact" on CPLR 208 tolling under the McCarthy standard).

The standard articulated in McCarthy has two components. First, the party must be "unable to protect [his] legal rights" and, second, the reason he is unable to protect his legal rights is "because of an over-all inability to function in society". I assume for the purposes of this motion that, during the period for which plaintiff seeks tolling, he had "an over-all inability to function in society." In this regard, plaintiff has had several "retention hearings" that have resulted in findings that Vallen should remain in an institutional setting. (Vallen Decl. ¶ 1) However, I still must consider whether plaintiff has raised a triable issue of fact as to his ability to protect his legal rights during the period for which he seeks tolling.

As part of their summary judgment burden, the defendants have come forward with evidence of Vallen's direct, personal and vigorous pursuit of his legal rights in judicial proceedings instituted during the period for which he claims tolling. In November 1998, plaintiff commenced an action in the Court of Claims of the State of New York alleging that the state had been negligent in permitting seven inmate assaults on him over the course of one and one-half years. (Peeples Aff., Ex. C) He was then familiar with the necessity of timely filing a claim, as evidenced by his handwritten complaint dated November 16, 1998, which recites as follows: "This claim is filed within 3 years after the claim accrued, as re-

quired by law." (Peeples Aff., Ex. C)[1] <u>Vallen v. State of New York</u>, Claim No. 100141 (N.Y. Ct. Cl. Sept. 1, 1999). He filed a second Court of Claims action in or around July 1999 alleging that the state had been negligent by permitting a patient identified as C.J. to initiate a physical attack.[2] (Peeples Aff. Ex. D) <u>Vallen v. State of New York</u>, Claim No. 100803 (N.Y. Ct. Cl. Apr. 17, 2001). Plaintiff filed a third Court of Claims action in July 1999, alleging that the state was negligent in permitting the theft of his personal property; in that action, he set forth a detailed list of each item of lost property and its value, including a "suit for court" ($279) and a pair of ostrich leather western boots ($350) (Peeples Aff. Ex. E) <u>Vallen v. State of New York</u>, Claim No. 100804 (N.Y. Ct. Cl. Apr. 17, 2001). Also in July 1999, he filed a Section 1983 action in this District alleging that his constitutional rights had been violated. (Peeples Aff. Ex. I) <u>Vallen v. Connelly</u>, 99 Civ. 9947 (SAS).[3] In March 2000, plaintiff filed a fourth suit in the Court of Claims alleging that falsified claims had been levied against him. (Peeples Aff. Ex. F) <u>Vallen v. State of New York</u>, Claim No. 102160 (N.Y. Ct. Cl. Sept. 1, 2000). In toto, between November 1998 and March 2000, Vallen, proceeding <u>pro se</u>, filed five separate lawsuits in two different fora in an effort to enforce and protect his legal rights. In two of the pleadings, he affirmatively expressed an understanding of the applicable statute of limitations. The 1999 federal court action evinces an awareness of a federal remedy and the procedural means to invoke it. <u>Cf. Cerami v. City of Rochester Sch. Dist.</u>, 82 N.Y.2d 809, 813 (1993) (considering, inter alia, the numerous lawsuits filed by the party claiming toll in rejecting such a claim).

In response to the defendants' evidence submitted on their summary judgment motion, plaintiff has been unable to raise a triable issue of fact as to his ability to protect his

---

[1] The same allegation is set forth in Vallen's 2000 state Court of Claims complaint. (Peeples Aff., Ex. F)
[2] To protect their privacy, all Mid-Hudson patients other than the plaintiff will be identified via their initials.
[3] <u>See also Vallen v. Connelly</u>, 36 Fed. Appx. 29 (2d Cir. June 11, 2002), <u>on remand</u>, 2004 WL 555698 (S.D.N.Y. Mar 19, 2004).

legal rights during the period for which he claims tolling. The plaintiff has had a full oppor-

tunity to conduct discovery. In his papers in opposition to summary judgment, he has exhib-

ited an understanding of the requirements of Rule 56, which were explained to him in the

Local Rule 56.2 Notice. Yet, nowhere does he address his ability or inability to protect his

rights during the time he has been in a mental health facility. Indeed, rather than rebut the

defendants' evidence, plaintiff notes that, during the period for which he seeks tolling, he

"pressed charges and the patient C.J. was convicted and sent to Orange County jail." (Pro Se

Affidavit in support to deny [sic] summary judgment) The closest he comes to responding to

the defendant's argument is the assertion that he lost some or all of his lawsuits on the basis

of "simple technicalities", thereby demonstrating that he was unable to protect his rights.

(Pro Se Mot. to Den. Summ. J. at 1) But it does not follow that because other claims he as-

serted were dismissed on various grounds that, therefore, he was unable to assert the claims

that he belatedly asserted in this action. He also asserts that the express reference to the stat-

ute of limitations in two of his filings "was only a mere statement I read in a book . . . ." (Pro

Se Mot. to Den. Summ. J. at 1) The source of his awareness of his rights is not relevant to

this motion.

   To the state employees who are named as individual defendants in plaintiff's

Section 1983 claim, it is no small matter to allow a stale claim to stand when there is no basis

in the record for tolling. These individuals would be required to defend themselves against

allegations concerning events that occurred long ago brought by a plaintiff who has amply

demonstrated his ability to file a lawsuit in a timely manner in other instances where he has

felt aggrieved.

   I conclude that the plaintiff has failed to raise a triable issue of fact on his

claim that he was "unable to protect [his] legal rights" for the period commencing from No-

vember 18, 1998, the date of his first Court of Claims Complaint. On the issue of tolling, the plaintiff bore the burden of proof and, in response to defendant's motion, he failed to come forward with evidence sufficient to require a trial on this issue. Holy See (State of Vatican City), 17 A.D.3d at 794; Assad, 238 A.D.2d at 457. However, there remains the question of which incidents occurred more than three years prior to the commencement of this action, i.e. prior to December 10, 1998.

Plaintiff has stated that in the "first few months" after his May 18, 1997 assignment to Mid-Hudson, defendant Gonzales predicted that violence would be "coming [his] way." (Vallen Dep. at 216) This is Incident No. 1 in the Appendix. According to the AC, during his first months at Mid-Hudson, defendant SHTA Carrol predicted that the plaintiff would have some accidents, defendant SHTA Malfatone was aware that patient John Doe No. 1 had violent tendencies, and defendant SHTA Gonzales failed to intervene during an assault that John Doe No. 1 made against the plaintiff. (AC at 3, 5, 8; Vallen Tr. at 216, 219-20) Additionally, on November 8, 1998, a patient identified in the AC as "Reshawn" physically attacked the plaintiff in front of defendant Gantz, who allegedly failed to intervene. (Complaint at 17) This is Incident No. 9 in the Appendix. One to two weeks later, defendant SHTA Gantz allegedly threatened and punched the plaintiff. (Vallen Dep. Tr. at 56-59) This is Incident No. 10 in the Appendix. Sometime between the Reshawn incident and the Gantz incident, Malfatone instructed the plaintiff to stop drinking from a water fountain, and knocked him to the ground. (Vallen Dep. Tr. at 230) This is Incident No. 13 in the Appendix.

The plaintiff does not dispute that these incidents all occurred between May 18, 1997 and late November 1998. The three-year statute of limitations for these incidents accrued, and plaintiff's claims were thus time-barred, prior to the commencement of this ac-

tion on December 10, 2001.[4]  The defendants' summary judgment motion is granted as to

Incident Nos. 1, 9, 10 and 13 set forth in the Appendix, and this portion of the plaintiff's ac-

tion is dismissed.  Though claims based upon these occurrences are barred by the statute of

limitations, I will consider the underlying facts to the extent they are relevant to plaintiff's

opposition to the other prongs of defendants' motion.  See Jute v. Hamilton Sanstrand Corp.,

Docket No. 04-3927 (2d Cir. August 23, 2005) (considering such facts in the context of Title

VII).

### 2.  Lack of Showing of a Defendant's Personal Involvement

The defendants, each of whom is individually accused of having deprived

plaintiff of constitutionally-protected rights, argue that certain of the plaintiff's claims should

be dismissed because there is no evidence of personal involvement in the events giving rise

to the asserted claims.  "It is well settled in this Circuit that 'personal involvement of defen-

dants in alleged constitutional deprivations is a prerequisite to an award of damages under §

1983.'"  Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) (quoting Moffitt v. Town of

Brookfield, 950 F.2d 880, 885 (2d Cir. 1991)).

There are five ways in which a plaintiff may show the personal involvement

of a defendant in a constitutional deprivation: (1) the defendant directly participated in the

alleged constitutional violation, (2) the defendant, having been informed of a violation

through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or

custom under which constitutional violations occurred, or allowed the continuation of such a

policy or custom, (4) the defendant was grossly negligent in supervising subordinates who

committed wrongful acts, or (5) the defendant displayed deliberate indifference to the in-

---

[4]  Assuming that the earliest of his claims accrued in May 1997 and was tolled under CPLR 208 from May 1997
to November 18, 1998, plaintiff had three years from November 18, 1998, i.e. until November 18, 2001 to as-
sert the claims.  He did not assert the claims prior to that date.

mates' rights by failing to act on information that unconstitutional acts were occurring.  See Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995).  Liability may not be anchored in a theory of respondeat superior.  Collins v. City of Harker Heights, 503 U.S. 115, 122 (1992). "The bare fact that [a defendant] occupies a high position in the [institutional] hierarchy is insufficient to sustain [a] claim."  Colon, 58 F.3d at 874.

The defendants identify six separate incidents for which they claim that the plaintiff can set forth no facts that indicate personal involvement on the part of the various defendants.  The plaintiff alleges that a Mid-Hudson patient, C.J., stabbed him with a pen near his eye while SHTA Nelson and John Doe defendants Nos. 2 and 3 were supposed to be supervising.  (AC at 11-12)  This is Incident No. 4 in the Appendix.  SHTA Nelson was never served and is not a party to this action, and the plaintiff has been unable to identify John Does Nos. 2 and 3.[5]  (Vallen Dep. Tr. at 106-07)  As such, his claims arising from this incident (No. 4) are dismissed.

The plaintiff alleges that in a separate incident, patient C.J. approached him, stabbed him near the eye, and attempted to gouge out his eye with his fingers.  (AC at 14) This is Incident No. 5 in the Appendix.  Plaintiff asserts that John Doe defendants Nos. 1, 2 and 3 observed this incident and failed to intervene.  (AC at 14)  However, the plaintiff is unable to identify John Does Nos. 1, 2, and 3.  (Vallen Dep. Tr. at 120-21)  Because there is no evidence of personal involvement on the part of any defendant remaining in this action, plaintiff's claim arising from this incident (No. 5) is dismissed.

In a third incident involving patient C.J., plaintiff alleges that two Mid-Hudson employees permitted C.J. to assault him in a facility dining room.  (AC at 10-11)

---

[5]  According to Donna DeLusso, director of Human Resources at Mid-Hudson, SHTA Nelson has not been employed by Mid-Hudson since his retirement on October 30, 1999.  (DeLusso Aff. ¶ 4)

This is Incident No. 6 in the Appendix.  Plaintiff alleges that afterward, defendant Carrol laughed about the incident and expressed regret that he had not been present to observe the assault.  (AC at 11)  However, the plaintiff does not identify any employee who observed the assault, and the alleged after-the-fact laughter and comments of defendant Carrol, while callous and distasteful, do not rise to the level of a constitutional violation.  Cf. Moncrieffe v. Witbeck, 2000 WL 949457, at *3 (N.D.N.Y. June 29, 2000) (allegation that corrections officer laughed at plaintiff does not state an Eighth Amendment claim).  Plaintiff's claims arising out of this incident (No. 6) are dismissed.

Next, the plaintiff asserts that another Mid-Hudson patient, A.A., had a long history of attacking people, and that Mid-Hudson staff intentionally placed A.A. in the plaintiff's proximity.  (AC at 15-16)  This is Incident No. 7 in the Appendix.  Plaintiff alleges that SHTA Nelson positioned A.A. close to the plaintiff, and that A.A. attacked him.  (AC at 15-16)  However, Nelson was not served in this action, and the plaintiff has identified no other Mid-Hudson employees who were involved in the incident.  Because there are no facts in the record before me indicating that any defendant to this action was personally involved in or supervised A.A.'s attack, plaintiff's claim arising out of this incident (No. 7) is dismissed.

The plaintiff claims that SHTA March shouted at him and pushed him in a bathroom.  (AC at 23)  This is Incident No. 11 in the Appendix.  However, March was not served in this action, and none of the defendants who are parties to this action were implicated in these events.  Because there are no facts in the record before me indicating that any defendant to this action was personally involved in the attack, plaintiff's claim arising out of this incident (No. 11) is dismissed.

Lastly, defendants move for summary judgment seeking the dismissal of plaintiff's claims arising from three incidents loosely raised in the AC.  Plaintiff alleged that

another patient, N., kicked and punched him, and that staff members laughed because N. was an older man. (AC at 24-25) This is Incident No. 14 in the Appendix. In another incident, the plaintiff alleges that an unidentified staff member gave another patient a key to plaintiff's locker, leading that patient to steal $35. (AC at 25) This is Incident No. 15 in the Appendix. In the third incident, the plaintiff alleges that patient B. punched him in a bathroom. (AC at 25) This is Incident No. 16 in the Appendix. However, the plaintiff has not identified by name any members of the Mid-Hudson staff who were involved in these incidents. As a result, all claims arising from these three incidents (Nos. 14-16) are dismissed as to all defendants.

### 3. Defendants' summary judgment Motion as to plaintiff's remaining claims

Defendants move for summary judgment dismissing plaintiff's remaining claims and assert that, in response to their motion, plaintiff has come forward with no facts from which a reasonable fact-finder could conclude that that he was deprived of any rights under the Fourteenth Amendment. In Youngberg v. Romeo, 457 U.S. 307, 315-16 (1982), the Court concluded that an involuntarily committed person has substantive rights under the Due Process Clause of the Fourteenth Amendment to be free from unsafe conditions of confinement. The Court reasoned that "[i]f it is cruel and unusual punishment to hold convicted criminals in unsafe conditions, it must be unconstitutional to confine the involuntarily committed—who may not be punished at all—in unsafe conditions." Id. See also DeShaney v. Winnebago County Dep't of Soc. Servs., 489 U.S. 189, 199 (1989) ("[T]he substantive component of the Fourteenth Amendment's Due Process Clause requires the State to provide involuntarily committed mental patients with such services as are necessary to ensure their 'reasonable safety' from themselves and others.").

Although Youngberg established that involuntarily committed mental patients have substantive due process rights, the standard articulated in the opinion for adjudicating claims based on those rights does not control here. Like Mr. Vallen, the plaintiff in Youngberg had been involuntarily committed to a state institution – albeit one for mentally retarded individuals – and had experienced violent attacks from other residents while staying there. See Youngberg, 457 U.S. at 310. The plaintiff alleged that the institution's director and two supervisors had known, or should have known, that the plaintiff was suffering injuries and that they failed to institute appropriate preventive measures. Id. The Court held that only an official's decision that was a "substantial departure from accepted professional judgment, practice or standards" would support a substantive due process claim brought by an involuntarily committed mental patient. Id. at 323. This standard reflected the Court's conclusion that a decision in this setting, "if made by a professional, is presumptively valid." Id. In defining its use of the term "professional", the Court appeared to include non-professionals acting under the direction of professional supervisors. Id. at 323 n.30. Unlike the defendants in Youngberg, the defendants here are low-level staff members. The nature of such an employee immediately addressing patient-on-patient assault or theft differs significantly from higher-level decisions like patient placement and the adequacy of supervision. For the latter decisions, it is readily possible to apply a test based on professional judgment, practice or standards. In this case, professionals made none of the challenged decisions, and thus the "substantial departure" test has no applicability.

In addition, the general approach to substantive due process claims appears inappropriate in this case. Usually, in order to establish a substantive due process violation for purposes of Section 1983, a plaintiff must show that the defendant's actions taken under color of state law involved "conduct intended to injure [plaintiff] in some way unjustifiable

by any government interest [and] . . . most likely to rise to the conscience-shocking level."

County of Sacramento v. Lewis, 523 U.S. 833, 849 (1998). However, for pretrial detainees

protected by the Fourteenth Amendment, but not the Eighth Amendment, the Court has ap-

plied the lower standard of "deliberate indifference" to Section 1983 claims arising from

state officials' inattention to their medical needs.[6] In Lewis, the Court reasoned:

> "Since it may suffice for Eighth Amendment liability that prison officials
> were deliberately indifferent to the medical needs of their prisoners, it follows
> that such deliberately indifferent conduct must also be enough to satisfy the
> fault requirement for due process claims based on the medical needs of some-
> one jailed while awaiting trial."

Id. at 850 (citations omitted). As in the case of pretrial detainees, the involuntary commit-

ment of mentally ill individuals does not constitute punishment for purposes of the Eighth

Amendment. See DeShaney, 489 U.S. at 199 ("[T]he State does not acquire the power to

punish with which the Eighth Amendment is concerned until after it has secured a formal ad-

judication of guilt in accordance with due process of law.") (citations omitted). However, the

Fourteenth Amendment still protects these individuals, including the plaintiff in this case.

See, e.g., Lombardo v. Stone, 2001 WL 940559, *7 n.7 (S.D.N.Y. Aug. 20, 2001) (rejecting

the Eighth Amendment as a basis for claims of a patient at a psychiatric facility who had not

been convicted of a crime and analyzing them instead under the Fourteenth Amendment).

Moreover, the state's central role in supervising and caring for the involuntarily committed –

---

[6] In the Eighth Amendment context, a "prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates" the inmate's constitutional protection. Farmer v. Brennan, 511 U.S. 825, 828 (1994). Officials must take "'reasonable measures to guarantee the safety of the inmates,'" including protection of inmates from other inmates' acts of violence. Id. at 832 (quoting Hudson v. Palmer, 468 U.S. 517, 526-27 (1984)). A failure-to-protect claim requires the plaintiff to satisfy both an objective test and a subjective test. The objective test requires that a deprivation must be "sufficiently serious," with a defendant's act or omission resulting in the denial of "the minimal civilized measure of life's necessities." Id. at 834 (citation omitted). To succeed on a deliberate indifference failure-to-protect claim, the plaintiff must also prove that a plaintiff was "incarcerated under conditions posing a substantial risk of serious harm." Id. By contrast, the subjective considerations look to whether a defendant had a "sufficiently culpable state of mind," one that reflects deliberate indifference to an inmate's health or safety. Id. (quoting Wilson v. Seiter, 501 U.S. 294, 297 (1991)).

like the pretrial detainees considered in <u>Lewis</u> – suggests that the conscience-shocking standard demands too much of such plaintiffs' substantive due process claims.

I am inclined to agree with the Eighth Circuit that the standard of "deliberate indifference" is the correct one for Section 1983 claims brought by involuntarily committed mental patients and based on alleged failures to protect them that violated their substantive due process rights.  See <u>Moore v. Briggs</u>, 381 F.3d 771, 773 (8th Cir. 2004).  However, I do not need to reach the issue because whether the defendants' actions are measured under the "conscience-shocking", the "substantial departure" or the "deliberate indifference" standard, the result is the same:  no reasonable fact-finder could conclude based upon the evidence, drawing all inferences in plaintiff's favor, that the defendants' conduct either shocked the conscience, was deliberately indifferent or substantially departed from accepted professional judgment, practices or standards.

Defendants argue that four incidents (Nos. 2, 3, 8, 12) set forth in the AC should be dismissed because there are no triable issues of fact that support plaintiff's claim.  I address them each in turn.

First, the plaintiff asserts that defendant Jones and that SHTA John Does Nos. 1 and 2 permitted patient C.J. to circle the plaintiff, and that C.J. then punched the plaintiff in the face several times.  (Vallen Dep. Tr. at 89-96; AC at 9-10)  This was the first alleged assault that C.J. inflicted upon the plaintiff, and is designated as Incident No. 2 in the Appendix.  The defendants assert that summary judgment is warranted because the plaintiff cannot point to any facts supporting a conclusion that defendant Jones had any advance knowledge of C.J.'s assault upon plaintiff or was deliberately indifferent to the assault once he observed it.  The defendants point to Vallen's deposition testimony that Jones "flew out from behind the desk and threw [C.J.] to the ground or something" when he saw that C.J. was

attacking the plaintiff. (Vallen Dep. Tr. at 96) There is no dispute that once an attack was underway, Jones actively intervened to stop a physical attack against the plaintiff. After intervening in the attack, Jones told the plaintiff that he saw C.J. "circling you, I knew he was going to do something, and then he did it." (Vallen Dep. Tr. at 95) While such a statement may be open to multiple inferences, this remark standing alone is insufficient to raise a triable issue of fact. Based on the plaintiff's own account, as soon as C.J. began the assault upon plaintiff, defendant Jones immediately intervened and restrained C.J. Defendant Jones's conduct was not indifferent to Vallen's fate but rather proactive and protective of him. Plaintiff's claim does not survive under any of the arguably applicable standards—conscience-shocking conduct, deliberate indifference or substantial departure from accepted judgment standards or practices. Defendants' motion for summary judgment as to this incident (No. 2) is therefore granted.

Next, the defendants assert that summary judgment is appropriate for an incident in which defendant SHTA Leper told Mid-Hudson patient C.J. to enter a bathroom that the plaintiff was using because it would not bother the plaintiff. (AC at 16) This is Incident No. 8 in the Appendix. Defendants assert that summary judgment is appropriate because Leper did not infringe the plaintiff's constitutional rights when he suggested that C.J. enter the bathroom. (Def.'s Mem. 20-21) In opposition, the plaintiff asserts that C.J. posed a risk of violence to him at that time, but he does not indicate that he endured any physical injury from C.J.'s presence. (Opp'n Decl. ¶ 8) However embarrassing this incident may have been to the plaintiff, it does not rise to the level of a Constitutional violation. See, e.g., Rodriguez v. Ames, 287 F. Supp. 2d 213, 219-20 (W.D.N.Y. 2003) (doctor was not deliberately indifferent to inmate's privacy rights when he conducted examination of inmate's bowel condition in prison cell because of lower privacy baseline in prison facilities); Robinson v. Middaugh,

1997 WL 567961, at *4 (N.D.N.Y. Sept. 11, 1997) ("plaintiff's claims that he was made to shower, dry off with a pillow case, and his private parts exposed due to the wearing of a 'paper suit', and sleeping on an unsanitized mattress do not rise to the level of deliberate indifference or the wanton infliction of pain."). The deprivation implicated is not sufficiently serious and does not deprive him of the minimal civilized measure of life's necessities. Cf. Farmer v. Brennan, 511 U.S. 825, 834 (1994). The defendant's motion is granted as to this incident (No. 8), and it is dismissed from this case.

Defendants move for summary judgment as to the plaintiff's claims concerning defendant SHTA Brown and Mid-Hudson patient F. This is Incident No. 12 in the Appendix. According to the plaintiff, F. commenced an attack on the plaintiff and began to kick him from behind. (AC at 24) At that point, according to the AC, "S.H.T.A. Brown jumped in to protect the patient who kicked me." (AC at 24) The AC does not assert that S.H.T.A. Brown was responsible for the attack, encouraged the attack, or had foreknowledge of the attack. To the contrary, the record and the allegations indicate only that once an attack was underway, defendant Brown attempted to restrain patient F. from attacking the plaintiff. In his deposition, the plaintiff volunteered that defendant Brown intervened when the plaintiff himself "started to go at [patient F.]." (Vallen Dep. Tr. at 229) Because the record does not support an inference that defendant Brown's conduct shocked the conscience, resulted from deliberate indifference or departed substantially from professional standards or practices, the defendants' motion for summary judgment is granted as to the incident (No. 12), and it is dismissed.

Finally, the defendants' motion for summary judgment is granted as to claims arising from an incident with Mid-Hudson patient S.W. This is Incident No. 3 in the Appendix. Defendants argue that the plaintiff can point to no admissible evidence from which a

reasonable fact-finder could find in plaintiff's favor. "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995); see also Gallo v. Prudential Residential Servs., L.P., 22 F.3d 1219, 1223-24 (2d Cir. 1994) ("[T]he moving party may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case."). The plaintiff alleges that he was walking up the staircase when S.W. punched him in the face. (AC at 9-10; Vallen Dep. Tr. at 97-98) He asserts that defendant SHTA Malfatone was present. (Vallen Dep. Tr. at 98) However, there is nothing in the record that shows whether SHTA Malfatone observed the attack and failed to act or intervene, or whether Malfatone was indifferent to the plaintiff's health or safety. As a result, the defendants' summary judgment motion seeking the dismissal of plaintiff's claim based upon this incident (No. 3) is granted because plaintiff has failed to raise a triable issue of fact under any of the applicable standards.

### 4.  Qualified Immunity and Law of the Case

Because claims arising from these incidents are dismissed on other grounds, I do not consider the defendants' contention that defendants Carrol, Jones and Leper are entitled to qualified immunity. Similarly, I need not consider the defendants' contention that the law of the case bars plaintiff from continuing to pursue his lost property claim for the $35 stolen from his locker.

CONCLUSION

The defendants' summary judgment motion is GRANTED. The Clerk is directed to enter judgment in favor of the defendants, and to dismiss this case.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
September 20, 2005

## APPENDIX TO MEMORANDUM AND ORDER
## IN VALLEN V. CARROL, 02 CIV. 5666 (PKC)

1.     Allegations Based on Events that Occurred During
Plaintiff's First Few Months at Mid-Hudson Forensic

SHTA Carrol told plaintiff that he was going to have some accidents. (AC at 3, 5)
SHTA Gonzales told Plaintiff that violence was coming his way. (AC at 5) SHTA Gonzales
heard patient John Doe #1 threaten plaintiff, and stood by as patient John Doe #1 hit plaintiff in
the head. (AC at 5) SHTA Malfatone "and other S.H.T.A. staff" were aware that this same pa-
tient, John Doe #1, was violent, but laughed and did nothing when patient John Doe #1 followed
plaintiff to his room and punched him. (AC at 8) The next morning, patient John Doe #1 came
up behind plaintiff at a sink and put a hair pick to his eyes and said that he wanted no more trou-
ble out of plaintiff. (AC at 8) SHTA Gonzales told plaintiff to stop causing trouble. (AC at 8)
These events (the "Initial Incidents") allegedly occurred within the first few months of plaintiff's
arrival at Mid-Hudson Forensic – within a few months of April 8, 1997. (Vallen Dep. Tr. 216,
219-20)

2.     The First Patient C.J. Allegation

SHTA Jones and SHTAs John Doe #1 and #2 "let" patient C.J. "circle around" plaintiff
until he got behind plaintiff. (AC at 9) Patient C.J. then punched plaintiff in the face and "tried
to take [plaintiff's eye out." (AC at 9) Plaintiff does not know who John Doe #1 and #2 are.
(Vallen Dep. Tr. 96) This was the first time patient C.J. had assaulted plaintiff. (Vallen dep. Tr.
at 89-91, 95-96; AC at 9-10)

3.     The Patient S.W. Allegation

Patient S.W. punched plaintiff on a staircase, and SHTAs Malfatone and Nelson were
there (the "S.W. Incident"). (AC at 9-10)

4.     The Second Patient C.J. Allegation

Patient C.J. was on assault precautions in the high observation area in the dayroom.
SHTA Nelson and SHTAs John Doe #2 and #3 were watching the ward. Patient C.J. walked to
where plaintiff was watching television, and stabbed plaintiff near his eye with a pen. (AC at 11-
13) Plaintiff cannot identify SHTAs John Doe #2 and #3. (Vallen Dep. Tr. 106-07)

5.     The Third Patient C.J. Allegation

Patient C.J. took a pen and left the precaution area while SHTAs John Doe #1, #2 and #3
were observing, walked to where plaintiff was seated watching television, stabbed plaintiff near
the eye, and tried to gouge plaintiff's eye with his fingers. (AC at 14) Plaintiff cannot identify
John Does #1, #2 or #3. (Vallen Dep. Tr. 120-21)

6. The Fourth Patient C.J. Allegation

SHTAs John Doe #1 and #2 allowed patient C.J., who was on assault precautions, to leave his line in the dining room, and patient C.J. then assaulted plaintiff while plaintiff was carrying his tray. (AC at 10-11, Vallen Dep. Tr. at 101) Plaintiff cannot identify SHTAs John Doe #1 or #2. (Vallen Dep. Tr. at 101) An hour later, SHTA Carrol laughed and said he wished he had been present to watch the assault. (AC at 11)

7. The Patient A.A. Allegation

Unidentified staff "indicated" that plaintiff was "a good target." (AC at 15) Patient A.A. was attacking people, and after SHTA Nelson placed patient A.A. in a chair a few feet from plaintiff, patient A.A. jumped from his chair and attacked plaintiff. (AC at 15-16)

8. The Allegation Against SHTA Leper

Plaintiff was in the bathroom, and SHTA Leper told patient C.J. to go into the bathroom because it would not bother plaintiff if patient C.J. went in (the "Leper Bathroom Incident"). (AC at 16-17)

9. The "Reshawn" Allegation

After SHTA Gantz had given plaintiff permission to do laundry, a patient whom plaintiff identifies as "Reshawn" pushed plaintiff in front of Gantz. (AC at 17) Reshawn then punched plaintiff in the mouth. (AC at 17-21) The blow split plaintiff's lip and broke one tooth and loosened another. (Vallen Dep. Tr. at 37-38) Plaintiff received fourteen stitches to his lip. (Vallen Dep. Tr. at 222-23) The Reshawn Incident occurred on November 8, 1998. (Vallen Dep. Tr. at 24; Peeples Aff., Exh. C, at 1)

10. The Gantz Bathroom Allegation

SHTA Gantz threatened plaintiff and punched him in the chest in a bathroom (AC at 21-22; Vallen Dep. Tr. at 56-59) The Gantz Bathroom Incident occurred a week or two after the Reshawn Incident, which occurred on November 8, 1998. Vallen Dep. Tr. at 24, 56-57; Peeples Aff., Exh. C, at 1)

11. The SHTA March Bathroom Allegation

SHTA March came into the bathroom at the Canteen, screamed at plaintiff, and pushed plaintiff across a room. (AC at 23)

12. The SHTA Brown Allegation

Patient F. kicked plaintiff from behind, and SHTA Brown jumped in to protect patient F. because plaintiff "started to go at" patient F. (AC at 24; Vallen Dep. Tr. at 229)

### 13. The SHTA Malfatone Water Allegation

SHTA Malfatone told plaintiff to stop drinking water from a water fountain in the yard, and came over and knocked plaintiff to the ground. (AC at 24) The Malfatone Water Incident occurred before the Reshawn Incident. (Vallen Dep. Tr. at 231-32)

### 14. The Patient N. Allegation

Patient N. kicked and punched plaintiff, and unidentified staff laughed because patient N. was an old man. (AC at 24-25) Plaintiff cannot identify the staff members. (AC at 24-25; Vallen Dep. Tr. at 233-35)

### 15. The $35.00 Allegation

An unidentified staff member gave the key to plaintiff's locker to another patient, who then took $35.00 in quarters from plaintiff's locker (the "$35.00 Incident"). (AC at 25) Plaintiff cannot identify the staff members. (AC at 25; Vallen Dep. Tr. at 235-39)

### 16. The Patient B. Bathroom Allegation

Patient B. punched plaintiff in the bathroom, and plaintiff chased patient B. out of the bathroom. (AC at 25) Unidentified staff saw plaintiff chasing patient B, but did not see patient B. assault plaintiff in the bathroom. (AC at 25; Vallen Dep. Tr. at 238-39)